Exhibit C

BRYAN CAVE LLP
Herbert Teitelbaum
Noah Weissman
1290 Avenue of the Americas
New York, NY 10104
*Attorneys for Dogsters, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – –— – – – – – – – – –

J&J SNACK FOODS SALES CORP.,

        Plaintiff,

        - against -

DOGSTERS, LLC,

        Defendant.

– – – – – – – – – – – – – – – – – – – – –

INDEX NO. 07-CV-03917 (AKH)

ANSWER AND COUNTERCLAIMS

Defendant Dogsters LLC ("Dogsters"), by its attorneys Bryan Cave LLP, hereby answers J&J Snack Foods Sales Corp.'s ("J&J") complaint dated May 15, 2007 ("Complaint"), and alleges in support of its counterclaims, as follows:

1.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint.

2.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint.

3.     Admits the allegations contained in paragraph 3 of the Complaint.

4.     Admits the allegations contained in paragraph 4 of the Complaint.

5.     Admits the allegations contained in paragraph 5 of the Complaint, and further avers that subject matter jurisdiction also arises under the Trademark Act of 1946, as amended, pursuant to 15 USC § 1121 and 28 USC §§ 1331 and 1338; and that supplemental jurisdiction arises under state statutory law and the common law pursuant

to 28 USC § 1367(a) because the claims and counterclaims are so related to the federal law that they form part of the same case and controversy and derive from a common nucleus of operative facts; and that jurisdiction also arises over all counterclaims for unfair competition pursuant to 28 USC § 1391(b).

6.  Admits the allegations contained in paragraph 6 of the Complaint, except denies that J&J can properly claim any right to recovery for any injury it may suffer from a denial of the declaration that J&J seeks; and further avers jurisdiction is also proper regarding the counterclaims pursuant to 28 USC §2201 because an actual case and controversy has arisen between the parties regarding whether J&J has any rights under a license agreement to market and sell Dogsters' products and J&J's position threatens injury to Dogsters.

7.  Admits the allegations contained in paragraph 7 of the Complaint and further avers that venue is proper pursuant to 28USC 1391(b).

8.  Denies knowledge and information sufficient to form a belief as to the truth of the allegation contained in paragraph 8 of the Complaint.

9.  Denies knowledge and information sufficient to form a belief as to the truth of the allegation contained in paragraph 9 of the Complaint.

10.  Denies the allegations contained in paragraph 10 of the Complaint.

11.  Denies the allegations contained in paragraph 11 of the Complaint, except admits that Integrated Brands Inc. ("IB") and Dogsters entered into a License Agreement, dated April 20, 2004 ("License Agreement") and respectfully refers to the License Agreement, dated April 20, 2004, for a full and complete statements of its terms.  A true and correct copy of the License Agreement is attached as Exhibit A.

2

12.    Admits the allegations contained in paragraph 12 of the Complaint, except denies that the letter was to CoolBrands International, Inc. ("Coolbrands") and respectfully refers to the March 29, 2007, letter from Jack Hassid for a full and complete statements of its terms.

13.    Denies the allegations in paragraph 13 of the Complaint, except admits that Dogsters counsel asserted in his March 29, 2007, letter that paragraph 14(a) of the License Agreement "provides, among other things, that the Licensee may assign the License Agreement to a third party only if that party is a 'third party acquirer of all or a majority of the business, assets or capital stock of Licensee...'"; and respectfully refers to the March 29, 2007, letter for a full and complete statements of its terms.

14.    Denies the allegations in paragraph 14 of the Complaint, specifically denies that counsel for J&J documented J&J's acquisition of a majority of IB's assets, and respectfully refers to the April 2, 2007, letter from A. Fred Ruttenberg, Esq., for a full and complete statements of its terms.  A true and correct copy of the April 2, 2007 letter of A. Fred Ruttenberg is attached as Exhibit B.

15.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

16.    Denies the allegations in paragraph 16 of the Complaint and respectfully refers to the April 2, 2007 letter of Ruttenberg for a full and accurate statement of its content.

17.    Denies the allegations contained in paragraph 17 of the Complaint.

18.    Denies the allegations contained in paragraph 18 of the Complaint.

19.    Denies the allegations contained in paragraph 19 of the Complaint.

20.    Denies the allegations contained in paragraph 20 of the Complaint.

3

21.    Denies the allegations contained in paragraph 21 of the Complaint.

22.    Dogsters repeats and restates each of the answers contained in paragraphs 1 through 21 as if fully set forth herein.

23.    Denies that any response is required to the assertions in paragraph 23 of the Complaint, but to the extent any response is required, Dogsters denies any allegations in paragraph 23 of the Complaint and avers that J&J is not entitled to any of the relief requested in paragraph 23 of the Complaint.

24.    Denies the allegations contained in paragraph 24 of the Complaint except admits that Dogsters maintains that IB improperly purported to assign the License Agreement.

25.    Denies the allegations contained in paragraph 25 of the Complaint, except admits that an actual, a present and a justifiable controversy has arisen between J&J and Dogsters concerning, among other things, J&J's claim that IB properly assigned J&J the License Agreement.

26.    Denies that any response is required to the assertions in paragraph 26 of the Complaint, but to the extent any response is required, Dogsters denies any allegations in paragraph 26 of the Complaint and avers that J&J is not entitled to any of the relief requested in paragraph 26 of the Complaint.

27.    Dogsters repeats and restates each of the answers contained in paragraphs 1 through 26 as if fully set forth herein.

28.    Denies the allegations in paragraph 28 of the Complaint.

29.    Denies the allegations in paragraph 29 of the Complaint.

30.    Denies the allegations in paragraph 30 of the Complaint.

31.    Denies the allegations in paragraph 31 of the Complaint.

4

32.     Denies the allegations in paragraph 32 of the Complaint.

33.     Dogsters repeats and restates each of the answers contained in paragraphs 1 through 32 as if fully set forth herein.

34.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Complaint.

35.     Upon information and belief, denies the allegations contained in paragraph 35 of the Complaint.

36.     Denies the allegations in paragraph 36 of the Complaint.

37.     Denies the allegations in paragraph 37 of the Complaint.

38.     Dogsters repeats and restates each of the answers contained in paragraphs 1 through 37 as if fully set forth herein.

39.     Admits the allegations of paragraph 39 of the Complaint.

40.     Admits the allegations of paragraph 40 of the Complaint.

41.     Admits the allegations of paragraph 41 of the Complaint.

42.     Admits the allegations of paragraph 42 of the Complaint.

43.     Admits the allegations of paragraph 43 of the Complaint.

44.     Denies the allegations contained in paragraph 44 of the Complaint.

45.     Denies the allegations contained in paragraph 45 of the Complaint.

46.     Denies the allegations contained in paragraph 46 of the Complaint.

47.     Denies knowledge or information in paragraph 47 of the Complaint.

48.     Denies the allegations in paragraph 48 of the Complaint and avers that no reimbursement is due J&J.

C042858/0206158/1386629.3

## AFFIRMATIVE DEFENSES

### AND AS FOR A FIRST AFFIRMATIVE DEFENSE

49.    J&J fails to state a claim upon which relief can be granted.

### AND AS FOR A SECOND AFFIRMATIVE DEFENSE

50.    J&J's claims are barred, in whole or in part, for failure of consideration in connection with its assertion that it obtained rights under the License Agreement.

### AND AS FOR A THIRD AFFIRMATIVE DEFENSE

51.    J&J's claims are barred, in whole or in part, by the doctrine of estoppel.

### AND AS FOR A FOURTH AFFIRMATIVE DEFENSES

52.    J&J's claims are barred, in whole or in part, because the License Agreement was terminated prior to its purported assignment to J&J.

## COUNTERCLAIMS

### Nature of the Action

1.    This is an action for injunctive relief and damages for trademark infringement, trade dress infringement, false designation of origin, deceptive trade practices, unfair competition, misappropriation, and unjust enrichment.

2.    Without Dogsters approval or consent, J&J knowingly, willfully, unlawfully, and intentionally misappropriated and exploited Dogsters longstanding and

6

famous trademark and tradename DOGSTERS, as well as other intellectual property and trade secrets, associated with Dogsters frozen, pet-food products.  J&J asserts that it has a right to do so pursuant to the License Agreement, between Dogsters and Intergrated Brands, Inc. ("IB"), which was never properly assigned by IB to J&J and was terminated prior to the purported assignment.

### Parties

3.    Dogsters LLC ("Dogsters") is a Delaware limited liability company, having a place of business at 161 Morningside Drive, Milford, CT 06460.

4.    J&J Snack Foods Sales, Corp. is, upon information and belief, a corporation organized under the laws of the State of New Jersey, with its principal place of business located at 600 Central Highway, Pennsauken, New Jersey.

### Jurisdiction and Venue

5.    This Court has subject matter jurisdiction over the claims in this action arising under the Trademark Act of 1946, as amended, relating to trademark infringement, false designations of origin and dilution pursuant to 15 USC §1121 and 28 USC §§ 1331, 1332 and 1338.

6.    This Court has supplemental jurisdiction over the claims in this action arising under state statutory law and the common law pursuant to 28 USC § 1367(a) because such claims are so related to the federal claims that they form part of the same case and controversy and derive from a common nucleus of operative facts.  This Court also has jurisdiction over all claims for unfair competition pursuant to 28 USC § 1338(b).

7

7.     Venue is proper before this Court pursuant to 28 USC § 1391(b) based on the residency of Dogsters and that a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in this District.

**Facts**

**Dogsters Brand and Business**

8.     Dogsters was founded by a father and son team, Ed and Greg DeLuca, in the fall of 2003, to bring to the market a new line of healthy, frozen ice-cream style treats for dogs.

9.     For three years prior to the product launch, the DeLucas worked with PhD, food scientists to research and develop a formula for dog treats that look like human treats but met Greg DeLuca's stringent requirements, which he calls the Big Four: Fun, Low Fat, Low Calorie and All Natural.

10.     During the first six months on the market, the DeLucas did a "soft launch" of three products for their frozen pet food line. More than two million "snow cups," one of the three products launched, were sold with distribution in only 17 supermarket chains in the Northeast.

11.     Dogsters quickly became a well-known and esteemed company and product line in the pet food industry, among consumers, and the fund-raising community for pet causes. Dogsters attained a reputation for high quality and healthful pet treats, which pets and their owners loved. Dogsters accordingly acquired outstanding renown and invaluable goodwill throughout its markets in the United States.

8

12.    In April 2004, Integrated Brands, Inc. became Dogsters' licensee, rolling out Dogsters five premium products in May 2005.

13.    Dogsters and IB entered into a License Agreement in April 20, 2004, which is attached as Exhibit A.

14.    Dogsters is the owner of the registered trademark and trade name Dogsters for frozen food products, and all associated trademarks, service marks, trade names, logos, trade dress, copyrights, and other intellectual property (collectively, "Trademarks").

15.    Among the trademarks and trade dress used by Dogsters to identify different items in its product line, are the following: "Cookies and Snow," "Dogsters Healthy Treats," "Snow Cups," "United Fido Orbiters," and "Ya Yogurt Combos." These marks also have been registered with the US Trademark office.

16.    Upon the terms and conditions set forth in the License Agreement, Dogsters granted IB the exclusive right, license and privilege of using the Trademarks in the United States through certain specified distribution channels in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of all edible treats or snacks for dogs or other pets sold in a frozen form or intended to be eaten or served in a wholly or partially frozen state, including "ice cream style" novelties and cakes (collectively, "Dogsters Treats").

17.    Dogsters is the owner of the product formulas, recipes, trade dress, manufacturing processes or instructions or other "know how" used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats.

9

18.    Dogsters granted IB the exclusive right, license and privilege of using any all existing product formulations, recipes, trade dress, manufacturing processes or instructions or other "know how" used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats (collectively, "Trade Secrets").

19.    In the License Agreement, IB recognized the great value of the goodwill associated with the Trademark and acknowledged that the Trademark and all rights in the Trademark, the goodwill pertaining to the Trademark, and the Trade Secrets belong exclusively to Dogsters.  IB also agreed not to contest Licensor's rights in the Trademark or perform any material act or omission adverse to those Trademark rights.

**Termination of the License Agreement**

20.    On May 25, 2006, Dogsters attorney, by letter ("Default Letter"), advised IB that it was in material default of its obligations under the License Agreement.

21.    Dogsters noted, in the Default Letter, that in 2006, IB's distribution of Dogsters products had markedly and significantly decreased from 2005.  Dogsters was in nearly 30% fewer stores than the previous year.  The average number of facings per store had decreased 34% and the data was continuing to trend downward.  There also had been a sharp decrease in the net revenue from sales of Dogsters products from 2005 to 2006.  IB, which had indicated it could provide national distribution had only minimal distribution capabilities in the midwest and west.  Upon information and belief, IB also had not budgeted sufficient money for advertising, marketing, or slotting fees for

10

Dogsters Treats in 2006. Rather than expand Dogsters Treats distribution, as IB had promised it would do, IB largely abandoned these obligations. Accordingly, IB was in material breach of its obligation to use commercially reasonably efforts to distribute and sell Dogsters Treats.

22.     In addition, upon information and belief, IB failed in the last half of 2006 and the first quarter of 2007 to use commercially reasonable efforts in distributing and selling Dogsters Treats.

23.     The Default Letter also noted a breach of the quality control standards imposed by the License Agreement. Dogsters cited, as evidence, numerous complaints received concerning the quality of the Dogsters Treats manufactured and distributed by IB.

24.     IB then failed to cure its material defaults within 30 days or take necessary steps and diligently pursue them if the default could not be cured within 30 days, as provided for in Paragraph 9(c) of the License Agreement. Accordingly, the License Agreement terminated.

25.     In October 2006, Coolbrands International, Inc., the parent company of IB, announced that it was experiencing severe financial difficulties and had begun to divest itself of its assets.

26.     Dogsters contacted IB to discuss this announcement and its understanding that IB no longer was manufacturing products.

27.     Sales of Dogsters Treats had dropped to approximately $18,000 for the monthly reporting period beginning in December 2006, in comparison to approximately $111,000 during comparable period in 2005.

11

28.    Upon information and belief, the sales of Dogsters Treats continued to languish in the first quarter of 2007, as IB struggled with the collapse of its business and neglected its obligations to distribute and sell Dogsters Treats.

## Improper Effort to Transfer the License

29.    On March 30, 2007, IB advised Dogsters, by letter, of its intention to assign the License Agreement to J&J.

30.    J&J then sent an April 2, 2007 letter to Dogsters, stating that IB had assigned the License Agreement to it.  A true and correct copy of the April 2 letter is attached as Ex. B.

31.    In the April 2, 2007 letter, J&J advised Dogsters that it had "acquired substantial assets" from IB.

32.    The License Agreement granted IB only a limited right to assign the License Agreement to a third party acquirer: "Licensee may assign this Agreement … to any third party acquirer of all or a majority of the business, assets or capital stock of Licensee…."

33.    Upon information and belief, J&J did not acquire all or a majority of the business, assets or capital stock of IB.

34.    IB, accordingly, did not have the right under the License Agreement to transfer the License Agreement to J&J.

C042858/0206158/1386629.3

35.    On or about April 25, 2006, J&J announced that it will be marketing Dogsters Treats and that "with this unique canine-friendly brand, J&J [] will be a dogs best friend!"

36.    J&J further co-opted Dogsters goodwill and improperly attributed rights to Dogsters Trademarks to itself in its April 25 announcement by stating that "Dogsters® has a leg up on the competition, it is the only healthy, all natural, low calorie, and low fat frozen ice-cream style treat for dogs.  Dogsters® was named one of the top ten Regional New Products in *Frozen Food Age* 2005 Top New Product Awards."

## Count 1: Trademark Infringement

37.    Dogsters repeats and reincorporates herein by reference each of the foregoing allegations.

38.    J&J does not have the right to use the Trademark in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats.

39.    Nonetheless, J&J has done so and continues to do so in violation of 15 USC § 1114(1).

40.    Upon information and belief, the activities of J&J complained of herein constitute willful and intentional infringement of Dogsters trademark rights.  These activities were commenced and continue despite J&J's knowledge that the use of the Trademarks was and is in direct contravention of Dogsters' rights.

41.    J&J's use of the Trademarks in the manner described herein is likely to cause confusion and mistake in the minds of the purchasing public and, in particular,

13

C042858/0206158/1386629.3

tends to and does create the false impression that J&J products are manufactured and distributed with the authorization, approval, and sponsorship of Dogsters.

42.     Dogsters has no adequate remedy at law, and is suffering irreparable harm and damage as a result of the acts of J&J in an amount to be proven at trial, but believed to be in excess of $75,000. Dogsters also seeks and is entitled to J&J's profits, punitive or treble damages, costs and attorneys fees.

## Count II: False Designation of Origin

43.     Dogsters repeats and reincorporates herein by reference each of the foregoing allegations.

44.     J&J has affixed, applied or used in connection with the sale of their goods, false descriptions and representations, which tend falsely to describe or represent that the goods and services offered by J&J are sponsored by authorized by of connected with Dogsters.

45.     Upon information and belief, the activities of J&J complained of herein constitute willful and intentional use, appropriations,  and infringements of Dogsters Trademarks; completely and deliberately disregard Dogsters rights and were commenced and have continued despite J&J's knowledge that the use of a simulation or colorable imitation of the Trademarks in the manner described herein was and is in direct contravention of Dogsters' rights, in violation of 15 USC § 1125(a).

46.     Dogsters has no adequate remedy at law, and is suffering irreparable harm and damage as a result of the acts of J&J in an amount to be proven at trial, but believed to be in excess of $75,000. Dogsters also seeks and is entitled to J&J's profits, punitive or treble damages, costs, and attorneys fees.

14

### Count III: Common Law Trademark Infringement
### and Unfair Competition

47.    Dogsters repeats and reincorporates herein by reference each of the foregoing allegations.

48.    Upon information and belief, the activities of J&J complained of herein constitute common law trademark infringement and unfair competition.

49.    In addition to the activities described above, J&J has, without proper authorization, appropriated the Trade Secrets, including the existing product formulations, recipes, trade dress, manufacturing processes or instructions or other "know how" used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats.  This activity constitutes unfair competition.

50.    Dogsters has no adequate remedy at law, and is suffering irreparable harm and damage as a result of the acts of J&J in an amount to be proven at trial, but believed to be in excess of $75,000.  Dogsters also seeks and is entitled to J&J's profits, punitive damages, costs and attorneys fees.

### Count IV: Misappropriation of Dogsters' Trade Secrets

51.    Dogsters repeats and reincorporates herein by reference each of the foregoing allegations.

52.    J&J has, without proper authorization, appropriated the Trade Secrets, including the existing product formulations, recipes, manufacturing processes or

15

instructions or other "know how" used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats.

53.    J&J obtained the Trade Secrets from IB, which was contractually obligated under the License Agreement to keep them confidential.

54.    Dogsters has no adequate remedy at law, and is suffering irreparable harm

55.    Dogsters also has suffered damages as a result of the acts of J&J in an amount to be proven at trial, but believed to be in excess of $75,000. Dogsters also seeks and is entitled to J&J's profits, punitive damages, and attorneys fees.

**WHEREFORE**, Dogsters demands judgment against J&J as follows:

1.    That J&J, their officers, agents, directors, servants, employees, representatives, successors and assigns and all others in active concert or participation with them or any of them, be preliminarily and permanently enjoined and restrained:

(a) from using in any manner the trademark and trade name Dogsters and all associated trademarks, service marks, trade names, logos, trade dress, copyrights, and other intellectual property, any colorable imitation of the mark or any variation of the mark, and any thing or mark confusingly similar thereto;

(b) from representing, suggesting in any fashion, or performing any act which may give rise to the belief that J&J, or any of their goods are authorized or sponsored by Dogsters;

(c) from using, transferring, conveying or otherwise disseminating the Trade Secrets, including the product formulations, recipes, manufacturing processes or

16

instructions or other "know how" used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Dogsters Treats;

(d) from doing any other act or thing reasonably calculated or likely to cause confusion, mistake, or deception in the mind of the public or to induce the belief or to lead to purchasers or consumers into the belief that any products manufactured or distributed by J&J are Dogsters' products or that J&J is in any way connected, endorsed, sponsored, associated, affiliated or connected with Dogsters or its products, and from otherwise unfairly competing with Dogsters or misappropriating that which rightfully belongs to Dogsters.

(e)    from refusing to take appropriate steps to correct prior public statements as to its relationship with Dogsters products.

2.    That Dogsters be awarded monetary relief in an amount to be determined at trial, including:

(a) all profits, gains, and advantages wrongfully realized or received by J&J as a result of J&J's actions;

(b) all damages sustained by Dogsters as a result of J&J's actions;

(c) treble and punitive damages under common law, 15 USC § 1117, and any other applicable law

(d) the cost of this action and reasonable attorneys fees; and

17

(e)  such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      June 4, 2007

**BRYAN CAVE LLP**

By: _/s/Noah Weissman_
    Noah Weissman (NW 8592)
    Herbert Teitelbaum(HT 7762)
    Martha Lieberman (ML 2418)
    1290 Avenue of the Americas
    New York, New York  10102

*Attorneys for Dogsters, LLC*

18

## DOGSTERS LICENSE AGREEMENT

THIS AGREEMENT made as of the 20th day of April, 2004 by and between Dogsters, LLC, a Delaware limited liability company, having a place of business at 161 Morningside Drive, Milford, CT 06460 ("Licensor") and Integrated Brands, Inc., a New Jersey corporation, having a place of business at 4175 Veterans Highway, Ronkonkoma, New York 11779 ("Licensee").

WHEREAS, Licensor is the owner of the trademark and trade name DOGSTERS for frozen pet food products, and all other associated trademarks, service marks, trade names, logos, trade dress, copyrights and other intellectual property, including, without limitation, any modifications or substitutions hereafter made to the foregoing by Licensor (hereinafter collectively and/or individually referred to as the "Trademark"); and

WHEREAS, Licensee desires a license from Licensor to use the Trademark solely in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of "Articles," defined to mean all edible treats or snacks for dogs or other pet animals sold in a frozen form or intended to be eaten or served in a wholly or partially frozen state, including, without limitation, "ice cream style" novelties and cakes; and

WHEREAS, simultaneous with the execution and delivery of this Agreement, Licensee and Licensor are also entering into that certain Consulting Agreement by and between Dogsters, LLC and Integrated Brands, Inc. of even date herewith (the "Consulting Agreement").

NOW, THEREFORE, in consideration of the mutual promises herein contained, it is hereby agreed as follows:

1

1.    Grant of License

    a.    Articles:    Upon the terms and conditions hereinafter set forth, Licensor hereby grants to Licensee and Licensee hereby accepts the exclusive right, license and privilege of utilizing the Trademark in the Territory in the Channels solely in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of Articles. Licensee shall have the right to have third parties manufacture and or distribute Articles utilizing the Trademark for Licensee in Licensee's discretion, provided that such third parties agree in writing to comply with the quality control provisions and any other provisions relevant to such third party set forth in this Agreement.

    b.    Existing Formulas:    Licensor also hereby grants to Licensee and Licensee hereby accepts the exclusive right, license and privilege of utilizing any and all existing product formulations, recipes, trade dress, manufacturing processes or instructions or other "know-how" or other proprietary rights or intellectual property ("Existing Intellectual Property") used in connection with the development, manufacture, marketing, promotion, advertising, sale and distribution of existing Articles utilizing the Trademark. Licensee shall have the right to have third parties use Existing Intellectual Property in connection with the manufacture and or distribution of Articles utilizing the Trademark for Licensee in Licensee's discretion, provided that such third parties agree in writing to comply with the quality control provisions and any other provisions relevant to such third party set forth in this Agreement.

    c.    Exclusivity:    Subject to the terms of this Agreement, Licensor agrees that it will not use or license to anyone else the right (or otherwise appoint, permit, authorize, allow or enable anyone else) to use the Trademark in the Territory in the Channels in connection with any Articles. During the term of this Agreement, Licensee agrees that it will not enter into a license agreement to market

2

Articles utilizing the trademarks of any competitor of Licensor in the market for frozen pet food products.

    d.    <u>Reservation:</u> Notwithstanding paragraphs (a) and (b) above it is understood Licensor reserves to itself the right to use and license to others the right to use the Trademark in connection with any products and/or services not included within the definition of Articles.

    e.    <u>Territory:</u>    The exclusive license granted herein is for the United States and its territories and possessions, including, without limitation, Puerto Rico and Canada (the "Territory"). Before using or licensing to anyone else the right (or otherwise appointing, permitting, authorizing, allowing or enabling anyone else) to use the Trademark on any Articles in the Channels in any country or geographic area not then included in the Territory, Licensor shall first give Licensee at least 180 days prior written notice of its desire or intent to do so. Licensee shall then have 30 days after receiving any such notice from Licensor in which to elect to extend the Territory of the license granted hereunder to include the country or geographic area specified in such notice by giving Licensor written notice thereof; provided that Licensee shall not then be in material default of this Agreement. Licensee shall have 150 days after giving notice to Licensor of its election to extend the Territory to commence distribution of Articles in such country or geographic area. If Licensee fails to commence such distribution within said 150 days, the rights to use the Trademark in the Channels in such country or geographic area shall revert to Licensor. If Licensee desires to use the Trademark on any Articles in the Channels in any country or geographic area not then included in the Territory, Licensee will give Licensor at least ninety (90) days notice of its desire to do so; provided, however, that Licensee shall not then be in material default of this Agreement. If Licensee ceases distribution of Articles in any extended Territory then the right to use the Trademark in the Channels in such country or geographic area shall revert to Licensor.

3

f.    <u>Channels:</u>    The exclusive license granted herein is for sales and distribution through the following distribution channels (the "Channels"): Supermarkets, Grocery, Mass, Club, Convenience, Out-Of-Home, Food Service, Natural Foods, Drug and Military. Licensee shall be the exclusive manufacturer of Articles for sale and distribution by Licensor or its designee through the Internet and Direct to Consumer distribution channels; provided, however, that Licensor shall be entitled to purchase such Articles from Licensee at a price that is no greater than the lowest price then charged by Licensee to any Purchaser of the same Articles.

g.    <u>Performance:</u>    Licensee shall use commercially reasonable efforts in distributing and selling the Articles in the Territory in the Channels.

h.    <u>Other Articles:</u>    Licensee shall have a period of 8 months following the date hereof to commence test marketing of frozen entrees, dinners, side dishes for dogs or other pet animals, or any other edible materials not considered to be treats or snacks for dogs or other pet animals, using the Trademark, during which time period Licensor shall not use or license to anyone else the right (or otherwise appoint, permit, authorize, allow or enable anyone else) to use the Trademark on any such products in the Channels in the Territory or in any country or geographic area not then included in the Territory. After commencing such test marketing, Licensee shall have a period of 4 months to determine whether to proceed with a full distribution roll-out of such products. If Licensee commences such test marketing within said 8 month time period, and thereafter notifies Licensor off its intent to proceed with a full distribution roll-out within said 4 month time period, the rights to use the Trademark on such products in the Channels in the Territory (or other country or geographic area) shall be granted to Licensee on the terms and subject to the conditions set forth in this Agreement and such products shall thereafter be deemed Articles for all purposes hereof. If Licensee does not commence such test marketing within said 8 month time period, or notify Licensor off its intent to

4

proceed with a full distribution roll-out within said 4 month time period, the rights to use the Trademark on such products in the Channels in the Territory (or other country or geographic area) shall revert to Licensor.

2.   Royalty

a.     Rate:  Except as provided to the contrary herein below, Licensee agrees to pay to Licensor a royalty of four percent (4%) on the Licensee's Net Sales of Articles sold by Licensee using the Trademark. No royalty shall be payable on any Articles sold to Licensor and any Articles donated to any charity or given out as free samples.  As used herein, "Net Sales" means the gross sales price invoiced by Licensee to Purchasers of the Articles, minus (i) any credits given or deductions taken as a result of the return or destruction of such Articles, (ii) any promotional off-invoice case allowances or case bill-backs given, and (iii) any applicable sales or use taxes. The following shall not be deducted from gross sales in calculating Net Sales: cash discounts, discounts for early payment, volume rebates, slotting fees and costs incurred in manufacturing, selling or advertising the Articles, except for off-invoice or bill-back promotional case allowances. For all purposes of this Agreement, the royalty shall accrue on the sale of the Articles and the Articles shall be considered sold when shipped or billed out, whichever occurs earlier.  As used herein, "Purchasers" means entities directly invoiced by Licensee for Articles, including, without limitation, distributors who resell the Articles to retailers.   For Net Sales of Articles made outside of the United States, Licensee shall account to Licensor in U.S. Dollars at the rate of exchange as reported in the Wall Street Journal as of the date of accounting.

b.     First Royalty Advance:   Upon the execution of this Agreement, Licensee shall pay to Licensor the sum of One Hundred Fifty Thousand Dollars ($150,000.00) as an advance payment on account of future royalties accruing on Licensee's Net Sales of Articles utilizing the Trademark (the "Initial Advance").  Thereafter, except as provided in Section 2.c. herein below, Licensee shall not be

5

obligated to make any further royalty payments to Licensor until total royalties owed pursuant to Section 2.a. herein above exceed the amount of the First Advance, and any such further royalty payments shall be made pursuant to Section 2.d. herein below. If Licensee terminates this Agreement for cause pursuant to Section 9.c. herein below, and if total royalties accrued in accordance with Section 2.a. herein above during the term of this Agreement, including any sell-off period as provided in Section 9.h. herein below (the "Total Earned Royalties") are less than the amount of the First Advance, Licensor shall refund to Licensee, within thirty (30) days after receiving written notice from Licensee that Licensee has ceased selling any Articles utilizing the Trademark, an amount equal to the Initial Advance minus the Total Earned Royalties.

     c.    <u>Second Royalty Advance:</u>    If Licensee does not exercise its option to terminate this Agreement without cause pursuant to Section 9.b. herein below, Licensee shall pay to Licensor within thirty (30) days after the first anniversary of the date first written above the sum of One Hundred Fifty Thousand Dollars ($150,000.00) as an additional advance payment on account of future royalties accruing on Licensee's Net Sales of Articles utilizing the Trademark (the "Second Advance"). Thereafter, Licensee shall not be obligated to make any further royalty payments to Licensor until total royalties owed pursuant to Section 2.a. herein above exceed an amount equal to the sum of the Second Advance plus any unused portion of the First Advance, and any such further royalty payments shall be made pursuant to Section 2.d. herein below. If Licensee terminates this Agreement for cause pursuant to Section 9.c. herein below, and if the Total Earned Royalties are less than an amount equal to the sum of the First Advance plus the Second Advance plus any further royalty payments received by Licensor (the "Total Paid Royalties"), Licensor shall refund to Licensee, within thirty (30) days after receiving written notice from Licensee that Licensee has ceased selling any Articles utilizing the Trademark, an amount equal to the Total Paid Royalties minus the Total Earned Royalties.

6

d.    <u>Royalty Payments and Records:</u> Licensee agrees to keep accurate books of account and other records in sufficient detail so that the royalty payable hereunder may be ascertained properly. Within thirty (30) days after the end of each of Licensee's fiscal quarters which commence September 1, December 1, March 1 and June 1, Licensee shall furnish to Licensor accurate statements of sales of Articles using the Trademark during such previous fiscal quarter showing the number, description and Net Sales of such Articles. Such statements shall be furnished to Licensor whether or not a royalty is due. Each such report shall be accompanied by a check for the amount of royalty payments due with respect to the period covered by such report. The receipt or acceptance by Licensor of any of the statements furnished pursuant to this Agreement or of any royalties paid hereunder (or the cashing of any royalty checks paid hereunder) shall not preclude Licensor from questioning the correctness thereof at any time within two (2) years from the date Licensor received such statement and/or payment, and in the event that inconsistencies or mistakes are discovered in such statements or payments within said two (2) year period, they shall be rectified and the appropriate payments made by Licensee upon demand by Licensor. Any royalty payments, including accrued royalties, and audit findings, not paid when due shall be paid immediately upon demand and shall bear interest at an annual rate of two percent (2%) over the late of interest publicly announced by Citibank, N.A. in New York as its base rate in effect as of the date on which such overdue royalty amount should have been paid to Licensor.

Licensee agrees, upon request by Licensor, to permit Licensor or its authorized representative to have access during normal business hours and on reasonable advance notice to such books or records as may be necessary to determine the royalty in respect to any accounting period covered by this Agreement. Such audits shall be at the expense of Licensor and shall be limited to one such audit during any fiscal year of Licensee, unless they show that Licensee has understated the royalties by five

7

percent (5%) or more or Five Thousand Dollars ($5,000) (whichever is greater) for any quarter, in which case Licensee shall reimburse Licensor for its out-of-pocket expenses incurred in connection with the audit as well as pay to Licensor the required amount of additional royalties and Licensor shall thereafter be entitled to up to two (2) such audits during the immediately following fiscal year of Licensee. Licensee shall keep all books of account and records available for at least two (2) years after the submission of the relevant statement.

3.    Licensor's Authorized Representative/Approval Rights

     a.    <u>Licensor's Authorized Representative</u>:  Wherever Licensee is directed to furnish or supply to or otherwise take some action or perform some obligation in respect of Licensor in this Agreement, the term "Licensor" shall be deemed to include "or Licensor's authorized representative" unless written advice to the contrary is received from Licensor.

     b.    <u>Approval Rights:</u>  All Articles and other materials utilizing the Trademark, including, without limitation, advertising materials, packaging designs and other trade dress, point of sale materials, product formulations and finished goods Articles, shall not be introduced into the marketplace without the Licensor's prior approval, which Licensor agrees shall not be unreasonably withheld or conditioned.  Licensor shall approve or disapprove (along with a reasonable basis for disapproval) in writing all proposed Articles, finished goods product samples and other materials utilizing the Trademark  within ten (10) business days after submission of same by Licensee to Licensor.  If Licensor does not notify Licensee in writing that any submitted material is disapproved (such notice to include the reasonable basis for disapproval) within ten (10) business days after submission, Licensor shall be deemed to have approved such submitted material for all purposes of this Agreement.

8

4.    <u>Goodwill, etc.</u>

      a.    Licensee recognizes the great value of the goodwill associated with the Trademark and acknowledges that the Trademark and all rights therein and the goodwill pertaining thereto belong exclusively to Licensor. Licensee agrees not to contest Licensor's rights in the Trademark or perform any material act or omission adverse to said rights.

      b.    Licensee hereby agrees that its every use of the Trademark shall inure to the benefit of Licensor, and that Licensee shall not at any time acquire any rights in the Trademark by virtue of any use it may make of the Trademark other than the licensed rights granted herein.

      c.    Subject to being reimbursed for it's out of pocket expenses, Licensee agrees to cooperate fully and in good faith with Licensor for the purpose of securing, preserving and protecting Licensor's rights or any grantor of Licensor's rights in and to the Trademark.

      d.    Licensee agrees that it will use the Trademark only on or in connection with the Articles herein licensed, and that it will not adopt or use as its own a trademark the same or confusingly similar to any of the Trademark.

      e.    Licensee acknowledges that its failure (except as otherwise provided in Section 9.h. herein below) to cease the manufacture, sale or distribution of Articles utilizing the Trademark after the termination or expiration of this Agreement will result in immediate and irremediable damage to Licensor and to the rights of any subsequent licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure to cease the manufacture, sale or distribution, and Licensee agrees that in the event of such failure Licensor shall be entitled to equitable relief by way of temporary and permanent injunctions and such other and further relief as any court with jurisdiction may deem just and proper.

9

    f.       Licensee shall report to Licensor in writing any infringement or imitation of the Trademark it becomes aware of on Articles or products similar to Articles. Upon receipt of such report, Licensor shall promptly investigate such infringement or imitation and within thirty (30) days thereafter notify Licensee in writing of such action as Licensor shall deem appropriate, including, without limitation, commencement of any litigation. In the event Licensor decides to institute such litigation, Licensor shall offer Licensee an opportunity to voluntarily join in any such action. In the event that Licensee voluntarily joins in any such action, the expenses and any damages awarded as the result of a lawsuit or settlement reached as a result of a lawsuit shall be split fifty/fifty (50/50) by the parties after the out-of-pocket expenses have been reimbursed. In the event that Licensee chooses not to voluntarily join in any such action, Licensor shall be free to join Licensee as a party thereto. If Licensee does not join the suit voluntarily, all expenses shall be borne by Licensor, and all recoveries and awards shall be fully retained by Licensor. If Licensor decides not to institute such litigation or fails to give Licensee timely written notice of what action it deems appropriate, Licensee shall have the right to institute such litigation in which event Licensee shall be solely responsible for the costs of such litigation and shall be entitled to keep any recoveries therefrom and shall have the right to settle such litigation in Licensee's discretion, provided, however, that any settlement that would cost the Licensor any money or impose on Licensor any other obligation or limitation with respect to the Trademark shall require Licensor's consent, which shall not be unreasonably withheld, conditioned or delayed. Each party agrees to cooperate with the other party in any suit brought by the other party in compliance with this Section 4.f. subject to being reimbursed for its out-of-pocket expenses.

    g.       Licensor shall be solely responsible at its sole cost and expense for registering and maintaining registration of the Trademark in the Territory.

10

h.    Licensor acknowledges that its failure to perform its obligations set forth in the first sentence of Section 1.c. herein above will result in immediate and irremediable damage to Licensee and to the rights of any subsequent licensee. Licensee acknowledges and admits that there is no adequate remedy at law for such failure to perform said obligations, and Licensor agrees that in the event of such failure Licensee shall be entitled to equitable relief by way of temporary and permanent injunctions and such other and further relief as any court with jurisdiction may deem just and proper.

5.    Indemnification and Product Liability Insurance

a.    Except as provided to the contrary in Section 5.b. herein below, Licensee hereby indemnifies Licensor and undertakes to defend Licensor against and hold Licensor harmless from any claims, suits, damages, out-of-pocket expenses (including legal fees and out-of-pocket expenses) and losses arising from the activities of Licensee under this Agreement.  Licensee agrees that it will obtain and maintain throughout the term of this Agreement, at its own expense, liability insurance including product liability with a broad form vendors endorsement from an insurance company reasonably acceptable to Licensor providing adequate protection (at least in the amount of Ten Million Dollars ($10,000,000)) against any claims, suits, damages, expenses or losses arising out of Licensee's activities pursuant to this Agreement.  Such insurance shall include coverage of Licensor and its directors, officers, agents, employees, assignees and successors. As proof of such insurance, a certificate of insurance naming Licensor as an additional insured party will be submitted to Licensor by Licensee before any Articles using the Trademark are distributed or sold by Licensee, and at the latest within thirty (30) days after the date first written above. Licensor shall be entitled to a copy of the prevailing certificate(s) of insurance, which shall be furnished to Licensor by Licensee. Licensee

11

and its insurer shall provide Licensor with thirty (30) days advance notice in the event of the cancellation of said insurance.

      b.      Licensor hereby indemnifies Licensee and undertakes to defend Licensee and hold Licensee harmless from any trademark infringement claims, suits, damages, out-of-pocket expenses (including legal fees and out-of-pocket expenses) and losses arising out of or in connection with Licensee's use of the Trademark and any Existing Intellectual Property in accordance with the terms of this Agreement and any breach by Licensor of any obligation or representation contained in this Agreement. Licensor hereby represents and warrants to Licensee that (i) Licensor owns all of the rights necessary to grant to Licensee the license rights set forth in this Agreement and has not previously granted such rights to any third party under any agreement still in effect, (ii) Licensor has all necessary power, authority and rights to enter into this Agreement and perform all of its obligations hereunder, and (iii) Licensor has no knowledge of any current infringement of the Trademark that was not disclosed by Licensor to Licensee prior to the execution of this Agreement.

      c.      Either party shall notify the other party promptly in writing of any claim with respect to which such party is entitled to indemnification and defense from the other party. The indemnifying party shall then promptly undertake to defend such claim in accordance with this Agreement, provided, however, if the indemnifying party does not promptly undertake such defense, the party entitled to such indemnification and defense shall have the right to undertake its own defense at the cost and expense of the indemnifying party and shall have the right to settle such claim in its discretion, provided that that any settlement that would cost the indemnifying party any money or impose on the indemnifying party any other obligation or limitation with respect to the Trademark shall require the indemnifying party's consent, which shall not be unreasonably withheld, conditioned or delayed.

12

6.  Quality of Merchandise

    a.    Quality Control Standards:  Licensee agrees that (i) the Articles covered by this Agreement shall be of a suitable standard, appearance and quality as to be adequate for the protection of the Trademarks and the goodwill pertaining thereto and shall be, unless otherwise agreed by Licensor, made from all natural ingredients, of premium quality and formulated to be a "healthy" or "healthier" alternative to competing products, (ii) Licensee will cause the Articles to be sold and distributed in accordance with all applicable Federal, State and local laws and (iii) the policy of sale, distribution, and/or exploitation by Licensee shall not reflect adversely upon the good name of Licensor or the Trademarks. Licensee further agrees that the manufacturing and sanitation practices used to produce the Articles will comply with all applicable Federal, State and local laws, including, but not limited to, manufacturing codes, and that Licensee will not manufacture the Articles from inherently dangerous materials or substances and will not design the Articles so as to constitute any inherent danger.

    b.    Approval of Samples:  Licensee shall, before selling or distributing any Articles covered by this Agreement, furnish to Licensor, free of cost, a reasonable number of each of the Articles. The quality and style of such Articles shall be subject to the prior approval of Licensor (as provided in Section 3.b. herein above). After samples of the Articles have been approved by Licensor, Licensee shall not depart therefrom in any material respect without Licensor's prior written consent (as provided in Section 3.b. herein above), and Licensor shall not withdraw its approval of the approved Articles except for good cause when Licensor may in good faith have reason to believe that the approved Articles may be detrimental to the health or safety of the public. From time to time after Licensee has commenced selling the Articles and upon Licensor's written request, Licensee shall furnish, without

13

cost to Licensor, the requested reasonable amount of samples of the Articles being manufactured and sold by Licensee hereunder.

c.    Plant Approval: Any and all proposed plants to be used by Licensee to manufacture the Articles shall be subject to Licensor's prior written approval (as provided in Section 3.b. herein above). Licensor shall have access to any plant where the Articles are manufactured, at reasonable times and with reasonable advance notice during normal business hours, for the purpose of inspecting such plant and the Articles to the extent necessary to determine whether Licensor's quality standards are being met. After a plant has been approved by Licensor, Licensor shall not withdraw its approval of the approved plant except for good cause when said plant has deviated materially from its condition or procedures as of the time it was approved and Licensor may in good faith have reason to believe that the approved Articles may be detrimental to the health or safety of the public.

d.    Licensee shall have the sole responsibility with respect to the Articles for taking action, maintaining records or handling recalls and all costs associated therewith under the Consumer Products Safety Act, the Federal Food, Drug and Cosmetic Act or any other similar acts, orders or directives.

e.    Subject to the terms of this Agreement, Licensor acknowledges that Licensee shall have the right to make adjustments to its formulas for the Articles and to develop and market new Articles using the Trademark; provided, however, that any Licensor-owned formulas that are adjusted shall remain the property of Licensor. Any formulas for the Articles developed by Licensee shall remain the property of Licensee after expiration or termination of this Agreement. Any formulas for the Articles developed by Licensor shall remain the property of Licensor after expiration or termination of this Agreement. Any formulas for the Articles jointly developed by Licensee and Licensor shall

14

be deemed to be jointly owned by Licensee and Licensor after expiration or termination of this Agreement.

7.    Confidentiality

During the term of this Agreement and thereafter, both parties shall keep confidential and shall not cause or permit the disclosure to any third party, other than those whose duties hereunder require possession of such information, such as contract manufacturers and sub-licensees, of any confidential information disclosed by either party to the other pursuant to this Agreement. Confidential information may include, but is not limited to, formulas, production processes, research, marketing and sales information. Said confidentiality requirement shall not apply to any information which (a) was in the possession of a party on a non-confidential basis prior to the receipt of any disclosure to it by the other party, or (b) is or becomes, without disclosure by a party, part of the public knowledge or literature, or (c) otherwise lawfully becomes available to a party, from sources other than the other party, which sources did not acquire such information directly from the party or from any other person who is or was subject to any restrictions on disclosure, or (d) counsel to the party advises must be disclosed pursuant to a court order or by law or regulation or appropriate governmental authority, or (e) is independently developed by any party without directly or indirectly using or referencing any confidential information disclosed to it by the other party.

8.    Labeling, Promotion, Advertising and Use

a.    Licensee shall submit to Licensor for its prior written approval (as provided in and subject to Section 3.b. herein above) all new proposed tags, labels, containers, packaging, advertising, promotional or display materials or the like containing or referring to the Trademark.

b.    Licensee agrees that it will apply the proper reasonable notations, as specified by Licensor, indicating that the Trademark are owned by Dogsters, LLC and used with its permission on

15

all tags, labels, containers, packaging, advertising, promotional or display materials or the like containing or referring to the Trademark.

c.       Licensee warrants that all tags, labels, containers, packaging, advertising, promotional or display materials or the like containing the Trademark will comply with all applicable Federal, State and local laws.

9.   Term and Termination

a.       The initial term of this Agreement shall commence on the date first written above and shall continue for a period of fifteen (15) years thereafter, unless sooner terminated in accordance herewith.

b.       Licensee shall have the option of terminating this Agreement without cause by giving Licensor at least ninety (90) days written notice of such termination at any time prior to the first anniversary of the date first written above.

c.       Either party may terminate this Agreement if the other party shall be in material default of any obligation hereunder or under the Consulting Agreement by giving written notice calling attention to such default, specifying the nature thereof and the action required to correct the default and stating that this Agreement will terminate at the expiration of thirty (30) days from the date of the receipt by the other party of such notice, unless the other party shall cure such default within said thirty (30) day period, or if such default cannot be cured within said thirty (30) period, the other party, exercising due diligence, has commenced taking the steps necessary to prevent the recurrence of such default and is diligently pursuing such steps. Failure of either party to terminate this Agreement for any such default or breach shall not be determined a waiver of the right subsequently to do so under the same or any other such default or breach, either of the same or different character.

16

d.  Licensor shall have the right to terminate this Agreement by giving written notice of such termination to Licensee if Licensee discontinues its distribution and sale of Articles using the Trademark.  Licensee agrees to give Licensor prompt written notice of its intention to discontinue distributing and selling Articles using the Trademark.  If no such notice of discontinuation is given, Licensee shall only be deemed to have discontinued its distribution and sale of Articles using the Trademark if Licensee has commenced its initial distribution and sale of articles using the Trademark and thereafter for three (3) consecutive full calendar months does not have at least $20,000 per month of Net Sales of Articles.

e.      The license hereby granted may be terminated by Licensor forthwith without any notice whatsoever being necessary if Licensee discontinues its business or Licensee voluntarily submits to, or is ordered by the bankruptcy court to undergo, liquidation pursuant to Chapter 7 of the bankruptcy code. In the event this license is so terminated, Licensee, its receivers, representatives, trustees, agents, administrators, successors and/or assigns shall have no right to sell, exploit or in any way deal with or in any Articles covered by this Agreement, or any carton, container, packaging or wrapping material, advertising, promotional or display materials pertaining thereto, except with and under the special consent and instruction of Licensor in writing, which they shall be obligated to follow. Should Licensee file a petition in bankruptcy or is otherwise adjudicated a bankrupt or if a petition in bankruptcy is filed against Licensee and the Articles are attached and such petition is not discharged or dismissed or if an involuntary receiver is appointed for it or its business within ninety (90) days thereafter, Licensor may terminate this Agreement, in each case, if and when, but only if, a bankruptcy or other court of appropriate jurisdiction sells, assigns or otherwise causes this Agreement to be transferred to (1) a business which is a material competitor to Licensor's business or (2) a business which derives a material portion of its revenues from tobacco or from alcoholic beverages, or from

17

pornography or other explicit sexually related material, or which has been convicted of a felony or whose chief executive, financial or operating officer in his or her role as an officer of the company has been convicted of a felony.

      f.     Termination of this Agreement for any reason shall not release either party from any part of any obligation accrued prior to the date of such termination, or obligations continuing beyond termination of the Agreement.

      g.     Termination of this Agreement for any reason shall be without prejudice to any rights which either party may otherwise have against the other.

      h.     Upon expiration or termination of this Agreement for any reason Licensee shall have a period of six (6) full calendar months after the date of termination in which to phase out its use of the Trademark (i.e. use up all of its finished goods, raw material and packaging inventories, including additional inventories purchased by Licensee after such termination in order to "balance off" inventories held or committed to by Licensee prior to such termination), provided that all Articles to be sold, and all uses of the Trademarks, by Licensee during such six (6) full calendar month period are in compliance with the requirements of paragraphs 6 and 8 hereof. Licensee shall report to Licensor with respect to such sales and make the requisite royalty payment within thirty (30) days after the end of each month during the aforesaid six (6) full calendar month period. All duties and obligations of the Licensee under this Agreement shall remain in force during the sell-off period.

10.    <u>Right of First Refusal</u>

      If at any time during the term of this Agreement, Licensor decides to offer for sale any part of the business, assets or ownership interest of Licensor or the Trademark (the "Offer Interest") it shall so notify Licensee in writing of such intention to sell. Thereafter, Licensee shall have thirty (30) days from the date of such notice to make a formal, written offer to purchase (the "Licensee's Offer to

Purchase") which shall be irrevocable for a period of forty-five (45) days (the "Offer Period");
provided, however, that at the time of making of the Licensee's Offer to Purchase, Licensee must not
be in material breach of this Agreement, or, if prior notice of such breach has been given, and has not
been cured within the period specified in Section 9(c), or, if no prior notice of such a breach has been
given, and if Licensor alleges such a breach simultaneously with notice of intention to sell, Licensee
shall cure such breach with the time provided for the exercise of such right of first offer.

If, within the Offer Period, Licensor receives a competing offer from a third party or parties
(a "Third Party Offer"), it shall, within five (5) business days of receipt, provide Licensee with a copy
of said Third Party Offer(s). Thereafter, Licensee shall have fourteen (14) days within which to revise
the Licensee's Offer to Purchase (the "Licensee's Revised Offer to Purchase") so as to be equal to or
greater than the value of the Third Party Offer(s). If part or all of the consideration to be paid for the
Third Party Offer(s) is other than cash, the price stated in such Third Party Offer(s) shall be deemed
to be the sum of the cash consideration, if any, specified in such Third Party Offer(s), plus the fair
market value of the non-cash consideration. The fair market value of the non-cash consideration shall
be determined in good faith by the parties hereto or if the parties hereto cannot agree then the parties
hereto shall engage an investment banker or other financial expert of national reputation and
reasonably acceptable to the parties hereto to make such determination, and the judgment of such
expert as to the fair market value of such non-cash consideration shall be binding upon the parties
hereto. The costs of any such third party determination shall be shared equally by the parties hereto.
Licensor shall have fourteen (14) days after receipt of the Licensee's Revise Offer to Purchase to
advise Licensee of whether it will accept such offer. In the event Licensor accepts the Licensee's
Revised Offer to Purchase, the closing thereof will be held within sixty (60) days of such notice of

19

acceptance. Nothing herein shall require Licensor to accept any offer made by Licensee or any third party.

11.  Force Majeure

No failure or omission by Licensee in the performance of any obligation of this Agreement shall be deemed a breach of this Agreement nor create any liability if the same shall arise from any cause or causes beyond the reasonable control of Licensee.

12.  Warranty and Consumer Response

Licensee will, at no cost to Licensor, handle all warranty (guaranty) satisfaction, response and compliance and all consumer response relative to any of the Articles. Licensor shall promptly forward to Licensee, for handling, any and all such consumer inquiries that it receives.

13.  No Joint Venture

Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers, and neither party shall have the power to obligate or bind the other in any manner whatsoever.

14.  Assignment. Sublicense or Change of Control

a.    This Agreement shall be binding upon the parties hereto and their successors and permitted assigns.

b.    Licensor may assign this Agreement to any third party, provided that such third party is also assigned all of Licensor's right, title and interest in the Trademark as applied to Articles and Licensor shall furnish written notice of such assignment to Licensee.

c.    Licensee may assign this Agreement to any parent, affiliate or subsidiary of Licensee and to any third party acquirer of all or a majority of the business, assets or capital stock of Licensee, provided such third party is not a material competitor of Licensor in the market for pet food products, and further provided that any such third party shall agree in advance in writing to amend Section 1.g.

20

of this Agreement to insert the word "best" between the word "reasonable" and the word "efforts."
Except as provided below, any change in direct or indirect control over Licensee or any assignee of
rights of Licensee under this Agreement shall not be subject to the prior written approval of Licensor.
However, the occurrence of any of the following events shall not be permitted:

        (i)      any material competitor of Licensor in the market for pet food products
becomes the beneficial owner, directly or indirectly, of a majority of the issued and
outstanding shares of Licensee entitled to vote for the election of directors;

        (ii)      the stockholders of Licensee approve an agreement providing for a
transaction in which Licensee will cease to be an independent corporation and the
entity which will control it is a material competitor of Licensor in the market for pet
food products, or pursuant to which Licensee sells or otherwise disposes of all or a
majority of the assets of Licensee to a material competitor of Licensor in the market
for pet food products.

15.   Notices

    All notices to be made hereunder shall be in writing sent via certified, overnight or registered
mail (return receipt requested). Any Articles or materials submitted for approval under this Agreement
shall not be governed by the mailing type requirements of this Notice provision. Such notices and
statements shall be given to or made at the respective addresses of the parties as set forth below unless
notification of a change of address is given in writing, and the date of receipt shall be deemed the date
the notice or statement is received:

21

To Licensor:

Dogsters, LLC
161 Morningside Drive
Milford, CT 06460
Attn: Edward De Luca

-with a copy to-

Jack Hassid, Esq.
460 Park Avenue, 10th Fl.
New York, N.Y. 10022

To Licensee:

Integrated Brands, Inc.
4175 Veterans Highway, 3rd Floor
Ronkonkoma, NY 11779
Attn: David J. Stein, Co-CEO

16.  No Waiver, Etc.

None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement and in the other agreements between the parties hereto dated as of even date herewith which represent the entire understanding of the parties.

17.  Choice of Law

This Agreement shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of New York. The parties hereto agree to submit to jurisdiction in the state of New York, and further agree that any court proceeding relating to any controversy arising under this Agreement shall be in the United States Federal Court for the Southern District of New York located in Kings County.

18.  Submission of Agreement

This Agreement shall become effective only upon its execution by Licensor and Licensee.

19.  Duplicate Originals; Faxed Signatures

This Agreement may be executed in any number of counterparts, each of which will be an original and all of which will together constitute one and the same document. Signatures transmitted by telecopier will be deemed originals.

22

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed

as of the date and year first above written.

DOGSTERS, LLC

Dated: _April 20 '2004_    By: _____

INTEGRATED BRANDS, INC.

Dated: _____    By: _____

23

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed

as of the date and year first above written.

DOGSTERS, LLC

Dated:_____    By:_____

INTEGRATED BRANDS, INC.

Dated: 4/20/04    By:_____

23